Coven, J.
In this summary process action, stipulations by the parties established the plaintiff-landlord’s prima facie case for possession. The case proceeded to trial on the defendant-tenants’ claim that they were entitled to withhold rent under G.L.c. 239, §8A because an unremediated mold condition on the premises constituted a breach of the implied warranty of habitability. The tenants also counterclaimed for breach of the warranty of habitability as well as a breach of their right to quiet enjoyment, breach of the lease agreement, and G.L.c. 93A violations. At the close of the tenants’ case, the landlord filed a Mass. R. Civ. P., Rule 50(a) motion for a directed verdict. The motion was allowed, and the tenants appealed.
In his written decision allowing the landlord’s motion, the trial judge stated that (1) the tenants had followed the rent withholding procedures required under G.L.c. 239, §8A; (2) the tenants failed to demonstrate a causal nexus between the conditions of the premises and defendant Susan King’s (“King”) physical condition; and (3) the tenants failed to demonstrate a material breach of the tenancy and were not entitled, therefore, to cure their nonpayment as permitted under paragraph five of G.L.c. 239, §8A. No other findings were made. Nor was there any reference to the specific counterclaims raised by King.
Although captioned, incorrectly, as a Rule 50(a) motion for a directed verdict, the landlord’s motion in this jury-waived trial was actually one for involuntary dis *175 missal pursuant to Mass. R. Civ. P., Rule 41(b) (2). M.G. Perlin & J.M. Connors, Handbook of Civil Procedure in the Massachusetts District Court §9.36, at 289 (3d ed. 2003).
Rule 41(b) (2) ... permits the judge to decide a defendant’s motion for a finding in its favor at the close of the plaintiffs evidence either (1) on a strictly legal basis, by utilizing the directed verdict standard to determine whether the evidence establishes a prima facie case for the plaintiff; or (2) as the trier of fact, by assessing the credibility and weight of the evidence to determine if a preponderance favors the plaintiff.
DeVito v. Cellular Mobile Communications, Inc., 1993 Mass. App. Div. 48, 50. See also Parks v. Ricciardi, 2005 Mass. App. Div. 107, 107-108. While we agree that the trial judge’s statements constituted conclusions of law and do not provide a clear insight into whether the trial judge used a directed verdict standard or a weight-of-the-evidence standard, the landlord’s motion asked the court to apply a directed verdict standard. That standard required the judge to determine whether, from any evidence or combination of circumstances and reasonable inferences, a finding could be made in King’s favor. Poirier v. Plymouth, 374 Mass. 206, 212 (1978). It is under that standard that we review the evidence.[3]
In October, 2005, King experienced coughing and wheezing episodes, and retained the services of Gordan Mycology Laboratory, Inc. to inspect and report on the mold level in her apartment. Two inspections were done. The first inspection was conducted by Deborah Gordon (“Gordon”) on October 26, 2005. The inspection included taking airborne samples, a sample of visible mold in the bathroom from tiles and tub grout, and an examination of the air-handling system.
The air sampling indicated the presence of two types of airborne mold, Cladosporium and Penicillium, in the living room area The bedroom showed the presence of Aspergillus niger, Paecilomyces, and Penicillium. Aspergillus niger and Penicillium were detected in the outside hallway. The outdoor air sample tested positive for Cladosporium. The inspection of the air-handling system showed the presence of a mold called Orovisidium, as well as yeast, Aspergillus niger, Pennicillium, Cladosporium, and bacteria. There was no air filter in place at the time of Gordon’s inspection. The interior fiberglass lining of the system was deteriorated and dusty. Gordon’s report of this inspection stated that the air-handling system contained “typical microbial levels.”
At oral argument before this Division, counsel for King admitted that no mold detected was toxic.
It appears that following the first inspection, but before the generation of a written report, King contacted the landlord about possible mold in her apartment and a dirty air filter that she thought was causing her condition. To ameliorate her condition, King purchased an air filter machine for her apartment. This machine, as well as prescribed medication, provided some relief to King. In a medical report admitted into evidence, King’s allergist stated that “mold and dust mite hypersensitivity [were] the major offending allergens” giving rise to her problems.
The written report of the first inspection, dated November 9, 2005, was sent to the landlord on November 17, 2005. According to the landlord’s property manager, the report was forwarded to the engineering department, which sent it to a *176 company that did environmental testing for the landlord. The property manager testified that she was .not certain of what was then done. The property manager also testified that when first alerted about King’s concerns, she and a maintenance manager performed an inspection; and, as a result, the tub tile-calking was removed and replaced and an air filter was installed. King testified that no representative of the landlord responded to Gordon’s report and, as a result, she contacted the local board of health.
A second inspection was conducted on January 24, 2006. The same type of air samples were taken. An air filter for the air-handling system was in place on reinspection and tested positive for mold.
Gordon admitted on cross-examination that there are no accepted health standards for indoor mold growth or indoor airborne mold levels, except that visible mold must be remediated. Although Gordon testified that elevated mold levels can potentially be dangerous, she admitted that both the mold levels and the type of mold found in King’s apartment were typical.
King’s habitability, quiet enjoyment and consumer protection claims are all based on the mold in the tenants’ apartment. It is unnecessary to address the judge’s Rule 41(b) (2) motion ruling (hat King failed to establish a causal connection between the mold and her health problems. Even assuming that the medical report of King’s physician established tire causal connection the trial judge did not find, the evidence viewed in the light most favorable to King was insufficient to establish that a defect, or actionable condition, existed.
The State Sanitary Code distinguishes between a condition that makes a dwelling unit “unfit for human habitation” and that “may justify closing down, condemning, or demolishing a dwelling or dwelling unit,” 105 CMR §410.020, and a condition, either listed in the Code or certified by a local health board, that “may expose or subject to harm, the health or safety, and the well-being of an occupant or the public.” Id. It is clear that the condition of which the tenants complained in this action did not make their apartment uninhabitable.
A landlord does have a duty under 105 CMR §410.500 to maintain a unit’s “foundation, floors, walls, doors, windows, ceilings, roof, staircases, porches, chimneys, and other structural elements of his dwelling so that the dwelling... is ... free from chronic dampness.” Section 410.020 of 105 CMR defines “chronic dampness” as “the regular and/or periodic appearance of moisture, water, mold or fungi.” Although the record in this case discloses the existence of mold in the air-handling system and visible mold in the bathroom tub and tile area, there is no evidence that the occurrence of that mold was “regular” or “periodic.” Moreover, not all violations of the Code rise to the level of a breach of the warranty of habitability. McKenna v. Begin, 5 Mass. App. Ct. 304, 308 (1977). This case is about typical levels of the type of airborne mold and visible mold commonly found in residential units. To hold that the type of evidence advanced in this case is sufficient to establish an actionable condition would expose every landowner to liability for failing to undertake impossible remedial efforts. We conclude that as the tenants have failed to establish that a cognizable defect existed in the premises, there was no error in the allowance of the landlord’s Rule 41 (b) (2) motion.[4]
The tenants also contend that, even in the absence of a determination of a breach of the warranty of habitability herein, they were entitled to retain possession by tendering the rent determined to be owed to the landlord. The tenants *177 have vacated the apartment and, therefore, possession is no longer at issue. The issue of a right to cure is moot.[5] Further, the tenants’ “brief comment” on the right to cure did not rise to the level of appellate argument and need not be addressed. Cameron v. Carelli, 39 Mass. App. Ct. 81, 85-86 (1995).
Judgment affirmed. Appeal dismissed.
So ordered.

 Under either standard, a trial judge is required to make written findings in allowing a Rule 41(b) (2) motion. However, while the failure to make findings is error, Sugarman v. Malkemus, 1997 Mass. App. Div. 64, 66, the error is harmless if the evidence does not support a finding in favor of the plaintiff under a directed verdict standard. Ricciardi, supra at 108.

 In their brief, the tenants cite scientific journals in support of their argument that the fear of environmental contamination expresses a cause of action on both warranty of habitability and quiet enjoyment theories. The journals were never brought to the trial judge’s attention, nor was “fear” a theory of the tenants’ case at trial.

 General Laws c. 239, §8A, fifth par., as amended by St. 1981, c. 133, reads in pertinent part:
K the amount found to be due the landlord exceeds the amount found to be due the tenant or occupant, there shall be no recovery of possession if the tenant or occupant, within one week after having received written notice from the court of the balance due, pays to the clerk the balance due the landlord, together with interest and costs of suit, less any credit due the tenant or occupant for funds already paid by him to the clerk under this section.
This paragraph could be read as stating that, unless there is a monetary finding made in favor of a tenant, the tenant has no right to cure because nothing would be “due” the tenant. However, we note the position taken in W.E. Hartwell, Residential Landlord-Tenant Benchbook (Flaschner Jud. Inst. 2005) that “a tenant should be allowed his or her cure rights under the statute, even if the tenant recovers nothing on his or her counterclaims, so long as the counterclaims have some colorable merit.” Id. at 24.